## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHIEF COMMERCIAL
CONSTRUCTION, L.P.,

        Plaintiff,

        v.

ATOS IT OUTSOURCING SERVICES,
LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

2:23-cv-02127-NR

### OPINION[1]

**J. Nicholas Ranjan, United States District Judge**

This case concerns a commercial-lease dispute. At a high level, Chief owned the property at issue (office buildings that mostly housed high-capacity IT servers), and leased the property to Atos under a 2018 lease agreement. When the lease ended in 2023 and Atos left, Chief claimed that there was significant damage to the property, for which Atos was responsible under the lease. Atos agreed that it owed Chief some money for certain repairs, but that Chief was basically looking for windfall in the damage it was claiming and the money it was seeking. When the parties couldn't agree on a resolution, Chief filed suit, asserting a breach of the lease. The parties tried the case to the Court in a bench trial, consistent with the terms of the lease, which contained a jury-waiver clause.

---

[1] This Opinion serves as the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). *See* Fed. R. Civ P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

As discussed below, considering the evidence admitted at the bench trial, the Court finds that Atos was responsible for some of the asserted damages and not others, and will award Chief a total of $445,044.98 in damages under the lease.

## FINDINGS OF FACT[2]

After considering the trial exhibits, stipulations, deposition designations, and witness testimony, weighing the credibility of the witnesses, and giving due weight to all of the evidence, the Court finds as follows.

## I.    The Lease and Property at Issue

1. Chief is the owner and landlord of a commercial property located at 4920 Campbells Run Road, Robinson Township, Allegheny County, Pittsburgh, PA 15205.  ECF 42 at 1.

2. The property at issue consists of a secure data center with a multi-level office building, and a loading bay, containing 135,590 square feet of space, together with multiple, large parking areas and driveways serving the building.  *Id.* at 2.

3. Chief and its parent company, Wyatt Incorporated, have owned the property for over 40 years, and leased the property almost continuously to various tenants since 1983.  M. Mangieri Testimony, 174:19-21.  Chief first leased the property to National Steel in 1983, then to GENIX in 1988, and then to Affiliated Computer Services in 1996.  ECF 61.

4. Around 1997, Chief leased the property to Xerox (which had acquired Affiliated Computer Services).  M. Mangieri Testimony, 69:4-9; Ex. 5 at 5; ECF 61.

---

[2] The Findings of Fact identify certain critical facts, but are not exhaustive.  The Court finds and considers other relevant facts, which are described in the "Conclusions of Law & Analysis" section below as they relate to the application of certain legal principles.

Around 2015, Atos acquired Xerox and assumed the then-existing lease agreement.  M. Mangieri Testimony, 69:4-9.

5.  In 2018, Chief and Atos signed a new lease, which is the lease at issue in this case.  *Id.* at 69:13-16; Ex. 13.  The 2018 lease became effective June 2018 and expired May 2023.  Ex. 13.  At some point during the lease, Atos informed Chief that it did not plan to renew the lease at the end of its term.  M. Mangieri Testimony, 72:2-18.  Indeed, that's what happened; Atos did not renew for another term and moved out of the property in May 2023.  *Id.*

6.  The parties structured the agreement as what is known as a "triple net lease." M. Mangieri Testimony, 74:24-75:19.  In a triple net lease, the tenant, here Atos, is generally responsible for repairs and maintenance of the property.  *Id.* Because Atos assumed those costs during its tenancy, Atos paid a lower rate of rent compared to what Atos would have paid if it did not have to maintain and repair the property.  *Id.*  Any specific repair obligations were intended to be controlled by the language of the lease.

7.  In the lease, the parties agreed to a division of labor for the care of the property. Ex. 13.  Under Section 10(a), Atos was generally responsible for maintaining the property; however, Atos was not responsible for "ordinary wear and tear," "Casualty damage," or for maintaining the "Structural Elements" of the property.  *Id.*  Under Section 14(a), when Atos left the property in 2023, it agreed to return the property "in as good a state and condition" as it was in 2018.  *Id.*  But in returning the property to its 2018 condition, Atos still was not responsible for repairing any "Casualty damage" or damage from "reasonable use and wear thereof."  *Id.*  Further, under Section 37, Atos was responsible for disposing of any furniture that it "brought onto or kept on the [property]."  *Id.*

8. When the lease term started in 2018, Chief never formally inspected the property to detail its then-current condition. M. Mangieri Testimony, 70:7-21.

9. To maintain the property consistent with its lease obligations, Atos hired Ascent as the property manager. T. Blasingim Testimony, 213:8-16. Atos hired Ascent to, among other duties, maintain the facilities and grounds, bring in qualified vendors when necessary to maintain particular pieces of equipment, and perform monthly water treatments on the chillers. *Id.* at 213:22-214:6. Atos spent roughly $500,000.00 per year on maintenance of the property. *Id.* at 213:8-16.

10. After Atos moved out, Chief inspected the property and found a number of problems. Specifically, Chief believed that Atos was responsible for failing to (1) remove all the furniture from the property; (2) repair or replace the flooring; (3) repair the "EIFS"; (4) repair exterior caulking; (5) repair the parking lot; (6) repair or replace the fire system; (7) repair the cooling system; and (8) repair the generators. ECF 1.

11. For some issues, Atos disputed liability altogether. For others, Atos disputed the specific dollar amount that it owed Chief. After the parties were unable to resolve these issues, Chief filed this suit, alleging a breach of the lease and damages based on the above eight problems with the property. *Id.* Atos, in response, disputes the extent of breach and damages associated with these issues.

12. Before this suit was filed, the parties exchanged communications about the repairs, partially in an attempt to avoid this lawsuit. Many of these communications were entered into evidence at trial by both sides, with no objection. *See, e.g.*, Ex. 82. Under Federal Rule of Evidence 408, despite no objection from either side, some of this evidence is not admissible to prove or disprove the validity or amount of any disputed claim. That, of course, makes

sense, as offers could be made to simply buy peace or for reasons that aren't wholly tied to the legitimacy or value of the claim. So, the Court makes clear: (1) even though there were no objections, it will not consider the parties' pre-suit communications as evidence of the validity or amount of any claim; (2) to the extent any communications reflect a transmission of quotes or estimates for repairs, the Court will consider the underlying quotes as evidence of estimates to repair or replace certain items; and (3) consistent with Rule 408(b), the Court will consider pre-suit communications as it pertains to certain witnesses' biases or credibility more generally.

## II.  The Furniture Removal

13. After Atos moved out, Chief alleged that Atos was responsible for removing the furniture on the property. Chief offered testimony and photo evidence to demonstrate that Atos did not remove all of the furniture when it left the property. *See, e.g.*, Ex. 1 at ¶ 26. More specifically, the four-story building contained "substantial amounts of office furniture, high wall cubicles, [filing] cabinets, personal items, storage lockers, chairs of various models, conference room tables, kitchen equipment, appliances, and maintenance materials." Ex. 1 at ¶ 25.

14. Atos neither disputes the type of furniture left behind in the building nor the quantity. It only argues that it was not responsible for the removal of the furniture under the lease.

## III.  The Flooring System

15. The property, serving as a data center, had two types of floor panels, one with Liskey Mark 30 metal panels (which were in building 1), and one with wood panels (which were in building 2). Ex. 1 at ¶ 36. The flooring systems were raised to keep all of the equipment above the concrete and to allow room for wires, both power and data, to run below the floor and above the concrete. *Id.*

at ¶ 37. In maintaining these types of flooring systems, Chief's expert witness, Matthew Pia, credibly opined that those in charge of maintenance had to allow "tempered air to be directed to each piece of equipment, thus keeping the equipment from overheating." *Id.* According to Mr. Pia, Atos would have had to insert vents into the floor panels to direct air through the floor tiles for each piece of equipment. *Id.*

16. The Court finds that some of the panels in both buildings were damaged. Some of that damage was due to wear and tear, and some of it was due to Atos's failure to maintain the panels or the damage it caused to the panels when it moved out. B. Kopenshek Testimony, 327:12-24; J. Bostrom Testimony, 262:14-21.

17. Based on the circumstantial evidence here, including the photographs of the panels, how the facility was used, and concerns about the condition of the panels in the intervening time between 2018 and 2023, the Court concludes by a preponderance of the evidence that some of the panels were damaged by Atos during that time, and that the damage was not due to normal wear and tear. J. Bostrom Testimony, 262:14-21; Ex. 1 at ¶¶ 38-41. The Court further finds that Atos failed, at least in part, to maintain the flooring during this time, instead opting to move damaged panels around, and failed to use humidification within the area, which led to at least some of the damage (delamination, cupped tiles, etc.). J. Bostrom Testimony, 268:2-18; Ex. 1 at ¶ 38; M. Mangieri Testimony, 95:14-17; F. Episcopo Testimony, 44:1-4.

18. The problem Chief has here, though, is identifying which floor panels were damaged by Atos, and which were just worn due to the passage of time. Chief has not presented evidence of what the floor panels looked like in June 2018, which, as discussed below, is the reference point for the condition of the panels. *See* M. Mangieri Testimony, 70:7-21 (discussing that Chief never inspected the

property right before the 2018 lease).  That is, if the panels were in poor shape in 2018, Atos had no obligation to restore them to a better pre-2018 shape.  In fact, there was evidence presented that when the lease began in 2018, some parts of the flooring were "beyond end of life."  B. Kopenshek Testimony, 327:12-24.  Some panels in 2018 were warped, delaminating, and already had holes cut out from them.  *Id.*

19. Mr. Pia's expert report—though identifying problems with some of the panels—sweeps too broadly by essentially assuming all the damage to the panels was new since 2018 and caused by Atos.  *See* Ex. 1 at ¶¶ 47–52.  Thus, the Court cannot accept this testimony as sufficient for Chief to prove up its damages here.

20. At best for Chief is the fact that in some internal communications by Atos and Ascent, Ascent identified 702 wood panels in building 2 that were damaged.  *See* Ex. 56; ECF 64 at 14.  Based on those internal communications, the Court finds that there is sufficient evidence to find that Atos caused damage, beyond normal wear and tear, to those 702 panels.

21. Atos obtained quotes to repair and replace the 702 panels.  The Court finds that the cost to repair the 702 panels was $59,000.00, but that there was insufficient evidence to indicate that a repair would be effective, and based on the evidence submitted to the Court, the Court has doubts that a repair of those panels would be viable.  Therefore, the Court finds that the replacement cost is more appropriate.  The Court finds that the estimate of $178.00 per panel to repair the 702 floor panels is an appropriate and reasonable estimate.  This was within the range of quotes that Atos received.  Ex. 56.  This comes out to $124,956.00.  The Court further finds that simply replacing the entire floor— what Chief seeks—would result in a windfall to Chief, and so is not an appropriate measure of any damages.

22. In sum, the Court finds that when Atos left the property in 2023, it left the flooring in a worse state beyond normal wear and tear than when the lease began in 2018, as to the 702 floor panels.

## IV.    The EIFS

23. The "EIFS" is an "exterior insulation and finishing system" that provides a wear surface and weather barrier for the interior.  M. Monteith Testimony, 296:1-6.  Put differently, it is a multi-layered construction element on the outside of the building (like a stucco) meant to provide thermal insulation and protect the building from damage caused by the weather.  Ex. 1 at ¶ 54.

24. Multiple witnesses observed damage to the EIFS and exterior of the property. One witness, an employee of Chief's parent company, noted that it looked like a truck hit the loading dock, requiring patching, coating, and finishing to restore it.  M. Mangieri Testimony, 124:14-23.  Further, that same witness noticed damage to the exterior of the building where a sign used to be, as well as moisture in the lobby from damage to the EIFS.  *Id.* at 124:11-13, 202:19-22.  Mr. Pia found that in his experience, the damage to the exterior of the building, specifically the EIFS, was the result of "impact damage and the removal of Atos' signage."  Ex. 1 at ¶ 56.  The damage was more than just ordinary wear and tear.  *Id.* at ¶ 55.

25. The Court finds the testimony regarding the damage to the EIFS and exterior of the building credible.  Atos never offered sufficient evidence to rebut the damage claims to the EIFS, nor did it ever argue that repairs to the EIFS fell outside of its contractual obligations and instead should be considered a "structural element."  The Court thus finds that the damage and lack of repair to the EIFS is a result of Atos's breach of the lease and that damages are appropriate.

V.      **The Caulking**

26. The testimony was consistent regarding the caulking.  Chief's witnesses seemed to agree that the caulking was damaged before the parties signed the 2018 lease.  The president of Chief's parent company testified that 90% of the property's caulking was "bad" by 2017.  F. Episcopo Testimony, 52:23-53:1.  Mr. Episcopo's letter from 2017 supports his testimony that the caulking was already damaged prior to the lease.  Ex. 10.  Another of Chief's witnesses, Mr. Mangieri, testified that the caulking looked "very much the same" from when the lease began until the time of trial.  M. Mangieri Testimony, 205:20-23.  Mr. Pia credibly testified that the damage to the caulking was a result of exposure to sunlight and aging.  M. Pia Testimony, 144:5-8.

27. The Court finds that the caulking was already extensively damaged before the lease commenced in 2018.  Chief never offered any credible evidence that any damage to the caulking, outside of normal wear and tear, occurred after the lease took effect in 2018.

VI.      **The Parking Lot**

28. Part of the property during Atos's tenancy included a large and mostly unused asphalt parking lot.  When Atos moved out, the parking lot was in poor condition.  There was cracking through the surface of the asphalt, known as alligator cracking, and leveled gaps between parts of the asphalt.  M. Monteith Testimony, 291:2-19.  The asphalt was failing.  *Id.*; Ex. 1 at ¶¶70–71.  To fully repair the parking lot, contractors would have to first mill approximately 10,800 square yards of asphalt.  Ex. 1 at ¶ 74.

29. But these problems largely existed before Atos signed the 2018 lease.  The parking lot was old and needed major repairs even in 2018.  Mr. Mangieri testified that the parking lot before the lease looked "much the same as it does now."  M. Mangieri Testimony, 181:2-4.  Though both parties noted that the

parking lot required repairs, neither party repaired the parking lot before the lease became effective. *Id.* at 181:20-25. Atos offered credible evidence that the type of asphalt used is more than 27 years old—more than double the expected lifespan for this type of asphalt lot. M. Monteith Testimony, 292:10-14.

30. During the term of the lease, Atos performed repairs, including in 2020, spending about $25,000 in sealcoating the asphalt and performing crack repairs. M. Mangieri Testimony, 182:1-185:10. While Atos could have performed some more crack repairs, the parking lot wasn't used much (*e.g.*, four cars using 90 spots), and so the Court finds that the repairs that were performed were sufficient to maintain the upkeep of the parking lot. J. Bostrom Testimony, 276:2-277:24.

31. The Court finds that the parking lot was in substantially the same condition in 2023 as it was when the lease began in 2018, and that the maintenance that Atos performed (sealcoating and patching cracks) was enough to maintain an already failing parking lot. In sum, Atos was not required to mill a brand-new parking lot, and there was insufficient evidence to show that the state of the parking lot was worse in 2023 than in 2018, outside of normal wear and tear.

## VII.    The Fire Protection System

32. Another component of the property during Atos's lease was an operational fire protection system. During the lease, the fire marshal inspected the fire alarms regularly, and Atos never failed a single inspection. T. Blasingim Testimony, 246:10-16; M. Mangieri Testimony, 189:1-2; J. Bostrom Testimony, 289:24-25. When Atos left the property in 2023, the fire protection system was operational. T. Blasingim Testimony, 246:15-16; J. Bostrom Testimony, 289:22-23.

33. In 2018, the fire protection system was outdated.  By 2020, the servicer for the system recommended that the entire system needed to be updated because it was "end of life."  B. Kopenshek Testimony, 321:1-15; Ex. 99.  Atos did not pay for an entire upgrade to the system, but it did complete repairs "as needed to maintain operation."  B. Kopenshek Testimony, at 337:21-338:9.  The repairs included repairs to leaking pipes on the fire control, repairs to electronic faults on the panel, and repairs to ion detector faults.  *Id.*

34. The Court finds that Atos properly maintained the fire protection system and left it in a substantially similar condition in 2023 as it was when the lease began in 2018.

**VIII.    The Cooling System**

35. The property originally had eight working chillers when the lease began in 2018.  Ex. 1 at ¶ 89.  When Atos left the property, two of the eight chillers were not working properly.  Ex. 1 at ¶ 90.  At that time, Atos did not dispute that it owed something for the two damaged chillers.  *See* Ex. 59; T. Blasingim Testimony, 250:10-251:2.  In line with the evidence and both parties' positions, the Court finds that Atos is responsible for the damage to the two chillers no longer in operation.

**IX.    The Generators**

36. When the lease began in 2018, the property had eight working generators.  Ex. 1 at ¶ 81.  But when Atos left the property, two of the eight generators were no longer working.  Ex. 66; M. Mangieri Testimony, 133:12-14.  Cleveland Brothers regularly serviced the generators during the lease.  M. Pia Testimony, 155:15-21.  And when Atos moved out, Cleveland Brothers found that there were two damaged generators.  Ex. 66.  The Court credits Cleveland Brothers as a reliable source—both Atos and Chief relied on Cleveland Brother's estimates in this case.  *See id.*

37. The parties dispute how many generators were damaged when the lease ended in 2023.  At trial, Atos argued that only two were damaged when it left, relying on the Cleveland Brothers quote from when it moved out.  Ex. 66.  Chief argued that seven were damaged when Atos left, relying on a later Cleveland Brothers quote.  Ex. 1 at ¶ 84.  Weighing the evidence, the Court agrees with Atos, relies on the first quote, and finds that, when the lease ended, there were only two damaged generators.

38. The Court does not rely on the second quote for a few reasons.  First, Chief's own expert testified that Cleveland Brothers is a reliable source.  M. Pia Testimony, 155:15-24.  Mr. Pia testified that it would be "reasonable to conclude" that if Cleveland Brothers did not quote a repair, the generator did not need to be repaired at that time.  M. Pia Testimony, 158:8-12.  In the first quote, only two generators needed to be repaired.  Ex. 66.  Second, Chief received the second quote roughly eight-and-a-half months after the lease ended.  M. Pia Testimony, 159:1-3.  Chief did not offer a convincing explanation for why five extra generators now needed to be repaired eight-and-a-half months later.  Mr. Pia testified that he "assume[d]" seven generators were not working at the end of the lease because the difference between the two quotes "seem[ed] a little odd."  M. Pia Testimony, 100:13-20.  The first quote is from a reliable source, took place closer in time to when the lease ended, and Chief did not offer sufficient evidence or argument as to why the Court should instead rely on the second quote.  The Court finds that the first quote better captures the exact number of generators that were damaged when Atos left the property in 2023.

39. In sum, the Court finds that Atos is responsible for the damage to the two generators described in Exhibit 66 that were operational when Atos began the lease in 2018, but that were no longer operational when Atos left in 2023.

## CONCLUSIONS OF LAW & ANALYSIS[3]

A lease is a type of contract and is thus "controlled by principles of contract law." *Village Beer & Beverage, Inc. v. Vernon D. Cox & Co.*, 475 A.2d 117, 121 (1984) (citing *Pugh v. Holmes*, 405 A.2d 897 (1979)).   In a breach-of-lease suit, the law requires that the plaintiff prove (1) that a lease existed, (2) that the defendant breached the lease, and (3) the damages as a result of the defendant's breach.  *Pa. Supply, Inc. v. Am. Ash Recycling Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citing *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

It is the plaintiff's burden to prove these elements by a preponderance of the evidence.  *Discover Bank v. Booker*, 259 A.3d 493, 496 (Pa. Super. Ct. 2021) (citing *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa. Super. Ct. 1995)).  In its trial briefs, Chief argued that although it bore the ultimate burden, Atos bore the burden to prove which damages were from normal wear and tear and which weren't.  ECF 61, ECF 65. Under Chief's view, Chief would have the burden to show damages, but then Atos would be burdened to prove the extent to which those damages were normal wear and tear.   The Court disagrees with Chief's argument that "the party invoking a contractual provision for its benefit bears the burden of proving the provision applies."  *See* ECF 61.

The cases that Chief cites to support of its position do not apply because they arise in materially different contexts.   The cases primarily focus on insurance disputes, *see generally Consolidated Rail v. ACE Property & Casualty Ins. Co.*, 182

---

[3] The Court's legal analysis below will serve as the "conclusions of law required by Fed. R. Civ. P. 52(a)." *Reubush v. St. Paul Fire & Marine Ins. Co.*, No. 85-3576, 1986 WL 12033, at *1 (E.D. Pa. Oct. 23, 1986); *see* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.").

A.3d 1011 (Pa. Super. Ct. 2018), clauses that limited "a contractor's remedy to additional time to perform [] work" ("exculpatory provisions"), *John Spearly Const., Inc. v. Pa. Valley Area Sch. Dist.*, 121 A.3d 593, 604 (Pa. Commw. Ct. 2015), or are from outside of Pennsylvania, *Apple Glen Invs., L.P. v. Express Scripts, Inc.*, C.A. 8:14-cv-1527, 2016 WL 909322 (M.D. Fla. Mar. 10, 2016). Here, it is the Court's job to apply Pennsylvania law as it finds it. In a breach-of-lease case like this, the Court finds that Pennsylvania law has not carved out a burden-shifting scheme wherever "normal wear and tear" language is present. The language merely sets the lease's parameters for the damages that Atos must ultimately fix; it is not a standalone "exculpatory provision."

In interpreting the meaning of a lease agreement, courts must start with the plain text of the lease. *See Village Beer*, 475 A.2d at 121 (cleaned up). When the language is "clear and unambiguous," courts ought to give the words in the lease their ordinary meaning. *See Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.*, 126 A.3d 959, 977 (Pa. Super. Ct. 2015) (cleaned up). After reviewing the lease in detail, the Court finds that the relevant provisions are both clear and unambiguous. The Court thus gives effect to the ordinary meaning of the lease's provisions to follow.

A central question in determining damages here is which year ought to serve as the reference point for the condition of the property. That is, in returning the property back to its previous condition (minus ordinary wear and tear), what year is that? Atos argues that the reference point should be 2018, when the lease began. Chief argues that the reference point should date as far back to when Atos or its predecessor entities first occupied the property, which would have been under several prior leases. Turning to the words of the lease, the Court finds that the answer is 2018.

There are several provisions in the lease answering this question of how far back the Court ought to look. First, the lease defines the "Effective Date" as June 1,

2018. Ex. 13. Second, Section 3(a) states in part that "[t]he term of this lease and [Atos]'s obligation to make any and all payments required under this lease shall commence on the Effective Date (also known herein as the 'lease Commencement Date')." *Id.* Third, Section 3(c) states that absent any express language to the contrary, the "Prior Lease shall be deemed to have terminated upon the Lease Commencement Date." *Id.* Finally, Section 14(a) reads that Atos "will quit and surrender the Premises in as good a state and condition as they were *as of the Lease Commencement Date of the Lease*, reasonable use and wear thereof. . . excepted." *Id.* (emphasis added).

Read together, these provisions make clear that the reference point for how the property ought to look when the lease ended (minus ordinary wear and tear) is how the property looked in 2018. The parties expressly terminated any prior lease agreement and clearly defined the "Lease Commencement Date" as June 1, 2018. During trial, Chief viewed this lease as a continuation and incorporation of the prior leases. M. Mangieri Testonomy, 71:14-18. But that is in direct conflict with the express language that Chief ultimately approved in its lease. In assessing how much damage Atos is liable for, the Court must compare the property's condition in 2023 to the property's condition in 2018.

Under Section 10(a) of the lease, Atos had to maintain and repair all parts of the property discussed above. *Id.* With three carve-outs, Atos was responsible for fixing any damage to the property from 2018 to 2023. *See id.* Under Sections 10(a) and 14(a), if the damage was "ordinary wear and tear," "Casualty," or "Structural," then Atos was not liable to pay. *Id.* During trial, neither party argued that any noted damages were either "casualty" or "structural." Thus, incorporating the Court's findings above, the Court addresses each item of alleged damage, in turn.

## I.    The Furniture Removal

Under Section 37 of the lease, Atos was ultimately responsible for disposing of any furniture that Atos "brought onto or kept" on the property.  *Id.*  Atos argued against liability with respect to the furniture because most of the furniture was already there when Atos first assumed the prior lease.  *See* ECF 64.  Chief agreed that "the office furniture was there when [Atos] acquired the lease or was assigned the lease."  M. Mangieri Testimony, 108:20-22.  Because Atos did not own the furniture or originally purchase the furniture, in Atos's view, it was not responsible for disposing of it when moving out.  The Court disagrees.

Section 37 of the lease uses the language "brought onto *or kept*."  Ex. 13 (emphasis added).  Even if Atos inherited the furniture, there's no question that Atos "kept" the furniture on the property throughout its lease term.  So Atos has to pay to remove it.

Next is the question of damages.  To prove damages, Chief relied on the report and testimony of its expert, Mr. Pia.  In calculating how much it would cost to move the furniture out, Mr. Pia relied on a quote that he obtained from "burkeMICHAEL+." burkeMICHAEL+ provided Mr. Pia with one quote containing two estimates, one estimate for costs with union labor, and one estimate for costs without union labor. Ex. 1 (Exhibits C and D therein).  The two costs varied substantially, with the union estimate costing $258,512.00 and the non-union estimate costing $143,608.98.  *Id.* Mr. Pia opined that the costs were reasonable in his professional experience.  *Id.* at ¶ 33.

The Court finds that the lower $143,608.98 estimate is an appropriate and reasonable amount for removal of the furniture.  As discussed above, there was a significant amount of furniture left on the property in the four-story building, and so the Court would expect that the cost to be somewhat significant.

That said, the higher union quote seems to be unreasonably inflated, and nothing in the lease would require any repairs to be done by union labor, and so the Court does not use that to assess the amount of damages.

In sum, the Court finds that Chief has proven breach of Section 37 of the lease, and awards Chief damages pertaining to the removal of the furniture in the amount of $143,608.98.

## II.    The Flooring System

Based on the evidence presented at trial and as detailed in the Court's findings of fact, the Court finds that Chief met its burden in proving that Atos breached the lease with respect to the flooring system at the property.  That leaves the question of damages.

The Court found above that Atos offered credible testimony proving that it is not responsible for all damage to the floors.  Some of the floors were damaged from normal wear and tear.  Some of the floors were damaged before 2018.  Chief is not entitled to windfall damages from Atos.  Chief is entitled to a damages amount that accurately captures the costs that Atos is responsible for with respect to the damaged flooring.

The Court cannot rely on Chief's expert report by Matthew Pia in assessing damages here.  Mr. Pia only opined what it would cost to replace *all* of the damaged panels.  Mr. Pia never offered an alternative damages calculation where he limited damaged panels to post-2018.  And he never offered an alternative damages calculation that accounted for normal wear and tear.  Mr. Pia likely never offered these alternative calculations, in part, because he had "no information about what this property was like in 2018." M. Pia Testimony, 166:9-11.  In essence, what Chief gave the Court was an all-or-nothing approach.  It offered a method, calculations, and an amount to fix all of the damaged floors.  But it never explained how the Court

ought to consider the damages that Atos was not responsible for during its time at the property.

One element of Chief's burden was to prove damages. *See Pa. Supply, Inc.*, 895 A.2d at 600. Finding that there was a breach does not authorize this Court to merely surmise an appropriate damages amount. It was Chief's burden to ensure that there was evidence on the record that the Court could rely on in awarding a damages amount. In reviewing the evidence, the Court finds that the only competent evidence of a damages amount here is from some of the quotations obtained by Atos as it was in the process of exiting the property.

As noted above, and as reflected in Exhibit 56, the Court finds from the evidence and the reasonable inferences from the evidence, that 702 panels were damaged and should have been replaced, and that the replacement cost of $178.00/panel is a credible measure of the replacement cost. That amounts to $124,956.00.

The Court thus finds $124,956.00 in damages for the flooring to be appropriate.

## III.     The EIFS

Above, the Court found that Atos was responsible for the damage to the EIFS. Like the first two disputes, the Court must now assess the damages.

Here, Mr. Pia credibly opined that Chief must "ensur[e] the system's waterproofing and insulating functions are fully restored." Ex. 1 at ¶ 61. In repairing the EIFS, "based on how the system must be installed, existing panel areas must be coated to match the newly repaired panels." Ex. 1 at ¶ 63. According to Mr. Pia, the total cost in repairing the EIFS is $119,450.00. *Id.* These costs ultimately derive from quotes from RAM Corporation. Ex. 1 at ¶ 65 (Exhibit E therein).

The Court finds that Mr. Pia's opinion here is both reasonable and supported by the evidence. Mr. Pia testified that having worked with RAM Corporation in the past, he found this quote to be reasonable and representative of the "industry

standard." M. Pia Testimony, 77:21-78:3. Atos's own expert did not question the reliability of RAM Corporation. M. Monteith Testimony, 314:9-12. Having been presented with credible evidence without a convincing rebuttal, the Court is inclined to rely on Mr. Pia and RAM Corporation's estimate here.

The Court finds $119,450.00 in damages for the EIFS to be appropriate.

## IV.    The Caulking

The caulking was in substantially the same condition in 2023 as it was back in 2018. Under the terms of the lease, Atos only had to return the property to the same condition that it was in 2018. So the Court finds no breach here.

## V.    The Parking Lot

Like the caulking, the Court finds that the parking lot was in substantially the same condition in 2023 than it was in back in 2018. The Court finds no breach.

## VI.    The Fire Protection System

When Atos's lease began, the fire protection system was operational. When Atos's lease ended, the fire protection system was operational. The Court finds that Atos did not breach the lease with respect to the condition of the fire protection system. Chief is not entitled to damages for the fire system.

## VII.    The Cooling System

Finding that Atos breached its lease for failing to repair the two broken chillers, the Court now turns to damages.

The dispute between the parties here is relatively small. In 2023, Atos provided Chief with a quote for $27,283.00 to fix the two chillers. M. Mangieri Testimony, 216:1-217:5. Chief declined that offer, and now it seeks $30,964.00 to fix the two chillers. *Id.* The scope of the work remained the same, the additional request appears to be because of inflation. *Id.*

The Court finds that $27,283.00 is the appropriate amount of damages here. Under the lease, Atos was obligated to cover the costs to fix the two chillers. Atos

attempted to fulfill its obligations under the lease with respect to the chillers back in 2023.  Chief said no.  The Court will not hold Atos responsible for the additional $3,681.00 where it previously tried to make Chief whole for the damaged chillers.

The Court awards Chief $27,283.00 for the damaged chillers.

## VIII.    The Generators

Above, the Court found that Chief is entitled to damages for the two broken generators at the property.  The Court now turns to a specific damage amount.

The Court finds that $29,747.00 is the appropriate amount of damages here. In its findings above, the Court relied on Exhibit 66, a quote that Atos obtained from Cleveland Brothers, to determine that two generators were damaged and needed repairs.  The Court again relies on Exhibit 66 to determine a specific damages amount.  Cleveland Brothers estimated that repairs to the two broken generators would cost a total of $29,747.00.  Ex. 66.  And that is what Atos ought to pay here.

The Court awards Chief $29,747.00 for the damaged generators.

## **CONCLUSION**

For the foregoing reasons, the Court will, by separate order, enter judgment in favor of Chief and against Atos, and award Chief damages in the amount of $445,044.98. The breakdown of damages is as follows:

| Category | Damages Amount |
|---|---|
| **Furniture Removal** | $143,608.98 |
| **The Flooring System** | $124,956.00 |
| **The EIFS** | $119,450.00 |
| **The Cooling System** | $27,283.00 |
| **The Generators** | $29,747.00 |
| **Total** | $445,044.98 |

This amount is exclusive of any interest, administrative fee, costs, or attorneys' fees, which may be addressed by a post-judgment motion.

DATE: November 25, 2025                    BY THE COURT:

                                                                    /s/ *J. Nicholas Ranjan*
                                                                    United States District Judge